GREEN J.
delivered the opinion of the court.
This is a bill filed by the attorney general, in the name of the State, to recover of the Union Bank, the bonus agreed, by the eleventh section of the charter, to be paid, and also, the dividends which have accrued on the stock, owned by the State, in the bank.
The bank resists the payment of these moneys, alleging, that by the seventh section of the charter, these funds were *162 appropriated for the extinguishment of the bonds of the State after which, they are to go to the use of common schools, and that they avo to remain in the bank, in trust for the accomplishment of these objects. That until the State’s bonds shall be -paid, the funds cannot rightfully bo withdrawn from the custody of the bank. The sixth section of the charter directs, that whenever there shall have been five thousand shares of the capital stock of said bank subscribed, and the commissioners appointed in Nashville, shall certify that fact in writing to tho governor, be shall be authorized, and required to subscribe on behalf of the State, for five thousand shares of tho capital stock of said bank; and shall forthwith make and execute on behalf of the State, five hundred thousand dollars in bonds of one thousand dollars each, signed by him officially, and countersigned by the secretary of state, and under the seal of the Stale, hearing five per cent interest; which bonds were to be made payable at New York or Philadelphia, or at such place as the president and directors might direct, to the president, directors and company of the Union Bank, of the State of Tennessee, or assigns, at the periods and in tho proportions following: that is to say, one hundred and twenty-five thousand dollars at tho end of fifteen years; one hundred and twenty-five thousand dollars at the end of twenty years; one hundred and twenty-five thousand dollars at the end of twenty-five years; and one hundred and twenty-five thousand dollars at tho end of thirty years, and the interest upon said bonds to be paid half yearly; which bonds the governor shall hand over, and deliver to tire president, directors, and company of the Union Bank, of the State of Tennessee, in full payments of said stock. The governor was to hayo the power to appoint five directors for the management of said hank, annually, on tho first Monday of January, in each and everj year.
On the 1st day of January, 1833, after the individual subscriptions of stock had been made, as provided for in the charter, the bonds of the State were executed, as directed, and delivered to the Union Bank, and received by it in payment for five thousand shares of stock.
By the eleventh section of the charter, it is enacted, *163 “That in consideration of the privileges granted by , r ° ° ^ tire tank agrees to pay to the State annually, one ilia, on die a: ;tai stocic charte half of one per ceamm, on die amount of ¿lie paid in by stockholders other than the State.”
By the fundamental article in the charter, it is provided, that “half-yearly dividends shall be made of so much of the profits as shall appear to the directors advisable.”
This bonus, and these profits, the State insists it has a right to receive and dispose of at pleasure. The right thus claimed unquestionably exists, unless it has been relinquished by some other provisions of the charter,
The hank contends, that the seventh section contains such relinquishment. It is in these words; “Be it enacted, that the profits which may arise from the stocic, owned by the State, in the Union Bank, of the Stale’of Tennessee, after the bonds of the State shall have been paid, and also the bonus agreed to be paid by the bank to the State, for the privileges conferred by the charter, and also the interest, whicn may, from time to time accrue- upon the deposites of public money, by the treasurers of the State, shall be, and they are hereby appropriated to the use of common schools in this State,” &c.
It is insisted by the bank, that the words in the above section, “After the bonds of the State shall have been paid,” constitute a surrender of the right of the State to control the funds mentioned in the seventh section, until, out of them the principal and interest of the bonds are satisfied. Does this construction arise, by necessaiy implication, from tfre use of these words? In answering this question, we are to take the words employed by the legislature, in their obvious sense. We cannot be governed by the rule contended for by one of die counsel for the bank, “that the words are to be taken in the sense in which the promissor apprehended, at the time, that the promissee understood them.” The bank was not in existence at the time the legislature used the words. The charter was an offer, on the part of the State, of a contract, with the terms and stipulations in it, to those who might choose to become subscribers for stock. There could, therefore, be no knowledge, on the part of the legis *164 lature, as to the sense in which any of the terms of the contract would be understood by subscribers for stock; and it necessarily follows, that there can be no obligation, on the part of the State, arising from the above principle, to yield its construction of the charter, because the bank has put a different one on this section.
As it is a rule of law, and of common sense, that what a man does not expressly part with, he retains; (Preston, 191, 192,) it follows, that unless the words used in the seventh section of the charter, contain an express relinquishment of the right of the State, to control the funds in controversy, or unless this relinquishment arises, by necessary implication from the language employed, the State still has the right to their control.
There is an express dedication of these funds for the use of common schools, after the bonds of the State shall have been paid, but it is not contended, that there is any express appropriation of them for the payment of the bonds, much less, is there an express relinquishment of their control; but it is urged, that by necessary implication, a trust is raised for the payment of the bonds out of their funds, and that the bank, is constituted a trustee to carry this design into effect.
In order to a clear understanding of this question, let us inquire what is meant by necessary implication? In the case of Wilkinson vs. Adams, (1 Vez. and Beams, 466,) the Lord Chancellor says, “necessary implication means, not natural necessity, but so strong a probability of intention, that an intention, contrary to that which is imputed to the testator, cannot be supposed.” Taking this natural, and just definition, let us apply it to the case in hand.
The seventh section of. the charter says, “that the profits which may arise from the stock, owned by the State, in the Union Bank, of the State of Tennessee, after the bonds of the State shall have been paid, and also the bonus agreed to be paid by the bank, for the privileges conferred by the charter, and also the interest which may, from time to time, accrue upon the deposites of public money, by the treasurers of the State, shall be, and they are hereby appropriated to the use of common schools in this State.”
*165 Plainly, the interest of common schools was in the minds of the legislature, and was intended to be secured by the m-troduction of this section. We, therefore, see an express appropriation of these funds for that object. But a question arose, whether they could risk with the people, the creation of so large a debt as five hundred thousand dollars, and at the same time appropriate the whole of the profits of the bank, in a way that would exclude their future control of of them? A provision for common schools, would be an exceedingly beneficial measure; but the creation of a debt, by which the people would be exposed to future taxation, it was feared, would more than neutralize the benefits that might be acquired by the provisions for schools.' This consideration manifestly placed the members in a dilemma, as to the course they should take upon this subject. The proceedings upon Mr. Brown’s motion, to amend this section, by inserting before the word “bonds,” the words “accruing interest on the,” so as to make it read, “after the securing interest on the bonds of the Slate shall have been paid,” is evidence of this remark. That amendment was at first voted by the house. The effect of it would have been, to have vested in common schools a larger sum, by five hundred thousand dollars, than the section would have appropriated without it; and by this pledge, would have left the State to raise the sum required for the payment of the principal of the State bonds, by some other means. Upon a reconsideration of the subject, the members were not willing thus to put this fund beyond their reach, and the amendment was withdrawn. These proceedings are insisted upon, by all those who have argued for the bank, as evincing, on the part of the legislature, an understanding of this subject, in accordance with that for which they contend. We think, on the contrary, that if they are to be looked to at all, they prove that as it regarded an application of these funds, between the passage of the act, and the time at which they were to be vested in common schools; the legislature were not willing to take any decisive step. They, therefore, fix positively the time, when the right of the schools to the fund shall take effect, and leave the direction of it, during the intermediate *166 time,, to future legislation. That it was not intended to leave the bonus and the profits or: the stock of the State, in the Bank, as a sinking fund, to meet the accruing interest, and to extinguish the bonds as they fell due, is strongly indicated by the fact, that the seventh section, as originally introduced, contained the provision. It was, however, stricken out, and a section adopted in lieu of it, appropriating these funds unconditionally and immediately, as they might fall due, to common schools. This amendment wus afterwards amended, by the insertion of the words, “after the bonds of the State shall have been paid.” It is thus plainly indicated, that while, on the one hand, there was a strong inclination to appropriate the whole fund, as it might accrue, to common schools; on the other hand, they were afraid to place it beyond the reach of legislative action, until the bonds were paid; and not being willing to create from this source, a sinking fund to pay them, they chose to leave the subject in such a condition, that a future legislature might act upon it without embarrassment.
This view of the subject has been taken, not because the court thinks this is a proper judicial method of arriving at the meaning of the act, hut as it has been pressed upon the court by the counsel for the hank, it was thought to be, not altogether impertinent, to give it a passing notice, and to show that these proceedings indicate the reverse of that, for which they contend.
As, therefore, we must be governed by the meaning of the words which the legislature have used, the inquiry recurs, Is the appropriation contended for, necessarily implied? It is admitted by one of the counsel for the hank, “that the words used are susceptible of two interpretations.” They may mean, “that till the States bonds are paid,” the State reserves to herself the control of the profits of her stock, and bonus, and the interest of the public deposites. They may mean, that the State surrenders her right to control those funds, until, out of them, the bonds are satisfied, principal and interest.”
This admission, due alike to the candor, and known acquaintance with the meaning of language, of the learned. *167 counsel who made it, is in effect, a surrender of the 7 7 ^ tion. We have already seen, that Lord Eldon defines necessary implication, to be “so strong; a probability of in- • 1 . . , tention, that an intention contrary to that winch is imputed, cannot be supposed.” Now, if it be admitted, as it is here, that the words are susceptible of two meanings, and one of them is imputed, it follows, that the contrary one may be supposed. These words do not, therefore, raise the trust contended for, by necessary implication. To support the construction contended for, we are referred to cases in English books, where the testator used this language. “After my debts are paid, -I devise,” &c. and proceeded to dispose of his real estate. It was held, that the words used meant, “that lie would not give anything until his debts were paid, and that every tiling he had should be subject to his debts. 3 Vez. *?89:
In reference to cases of this description, it may be remarked, that as in England, real estate is not liable to the payment of simple contract debts, and as a moral obligation rests upon a man to make provision for the payment of his debts, when he has the means of doing so, the court will lay hold of almost any thing, in a will, indicating such an intention of the testator, in order to charge his real estate for the payment of debts. But it is laid down, (1-Equity, Ca. Ab. 196,) that “If a man devises to a stranger, after the death of his wife, this gives the wife no estate for life by implication; for it is but a demonstration when the estate of the stranger shall commence.” In the mean time, the estate would vest in the heir, and, therefore, it is not necessary to imply, that the testator intended that the wife should take it, as another meaning might be supposed. But if the devisor had said, that “after the death of his wife,” the heir should have the manor, the wife by necessary implication shall have the whole manor for life; foy the devisor’s intent is plain, that the heir is not to have the manor, while the wife lives.” 1 Eq. Ca. 156. From these two cases, the rule of construction will be obvious. Xu the first, there was a direction the estate might take, other than by vesting in the wife an estate for life; and as the words used, were susceptible of two *168 meanings, nothing should be implied, and the estate should vest in the heir, the legal owner. So here, the words are susceptible of two meanings', and as neither can be necessarily implied, the funds aré unaffected by the language employed, and remain in the legal owner.
In the other case, the heir was excluded by the plain meaning of the will, from taking the estate while the wife lived; and there being no one else in whom it could vest, it was necessarily implied, that the wife should have it during her life.
Had the legislature, in this case, in plain and unequivocal terms relinquished any right to the control of these funds until the State bonds had been paid, then as the funds are in the hands of the bank, and as it holds the bonds, and no one else has a right to the money; the bank, by necessary implication, would have had a right to retain, and apply it as indicated by the legislature. But this is not the case. The State may still control the fund, and the words may well mean, and do mean, that it reserves'the right to do so until its bonds are paid. They are, therefore, only “a demonstration when” the right of the common schools shall commence.
But if this section of the charter had expressly declared, that this fund should be set apart for the payment of accruing interest, and the principal of the State’s bonds, and then to vest in common schools, the consequence contended for would not have followed. It would, to be sure, have been a pledge of the faith of the government, that this fnnd should not be diverted from the object contemplated by the act; but it would have created no legal right on the part of the bank, to retain and control the fund. ■ It is said, that whenever England creates stock, she hypothecates some particular branch of the revenue, at the same time as a sinking fund. Suppose she does, what is it but a pledge of the faith of the government, that this particular fund shall be so applied? Did it ever enter into • the head of the holder of her government stock, that he was created a trustee for the management and custody of that branch of the revenue? Surely not; and who would contend, that in that case, the government of England, if it chose to do so, might not control that fund, *169 and pay the debt from other sources of revenue? all, who would for a moment suppose, that the government-might not control the collection, safe custody, and disbursement of such funds. If but one answer can be given to these questions,- let us apply the case supposed to the one in But abcve hand. The government of Tennessee is entitled to an annual revenue of one half of one per cent, upon the stock of individuals in the Union Baak, and to its share of the semiannual dividends upon its stock. From these sources it derives considerable revenue. Now suppose the legislature had directly declared, that this branch of the revenue of the State should be set apart for the extinguishment of its bonds. How would that differ in principle, or in,its legitimate consequences, from such a declaration to any other part of thé revenue? We can perceive no distinction. And yet we imagine, if this seventh section had declared, that the revenue arising from merchants license should be so set apart, it would never have been thought by any one, that the bank would have a right to interpose and receive that revenue, and retain for their own use a large amount of the public treasure, for a long series of years, upon the ground, that so much as might be due to it from tho State, was ultimately to be paid out of this fund, and that in the mean time, the State could not be trusted with its custody and management. Admitting that the faith of the State is engaged, that the bonds shall be paid out of this fund, that engagement does not pledge the fund in the hands of the State’s creditor, as a security for the payment. It is a promise on the part of the State that it will pay the debt from this source; but it is not a surrender of the right to collect it, and to disburse it, according to that - promise.
It is insisted by the counsel for the State, and we think with great reason, that the failure to stipulate in the charter* that the bank should pay interest on any sums arising from the dividends and bonus, goes far to show that it was not intended they should remain in the bank. It is hardly possible to conceive, that there should have been a stipulation for interest on government deposites, when it was known that from ordinary sources of revenue, these would be very ¡«.consider *170 able, and at the same time, to have been entirely insensible to the immense profits the bank would make upon the funds of the State, without, as it is contended, paying one cent for their use. The bank felt the pressure of this circumstance, and in the answer of the president to a call of the legislature in 1833, attempted to avoid its force, by supposing that the legislature were willing the bank should have the use of these funds, and by the profits upon them, neutralize what he calls “the oppressive tax of ten thousand dollars per annum.” We cannot conceive that any such purpose existed. Why was the bonus required to be paid by the eleventh section, if a provision had already been enacted in the seventh, by which it was neutralized? It would have been a much more simple method, to have granted the privileges of the charter, without exacting any bonus at all. The supposition of the bank is unreasonable, and does not tend to explain the strange inconsistency into which its construction of the seventh section would involve the legislature. . The interest upon government deposites, arising from the ordinary revenue, would have been too inconsiderable to have deserved legislative provision. But if the bonus and dividends were paid, and were placed on deposits in the bank, there would then be a fund, the interest on which would form a considerable item. Upon the whole, we are well satisfied, that there is nothing in the seventh section of the charter, that authorizes the bank to withhold from the treasurer, the payment of the dividends which have been declared upon the stock owned by the State, and the bonus agreed to be paid annually, for the privileges of the charter.
But if the bank were right in its construction of the seventh section, and a trust had been created of this fund, for the redemption of the bonds of the State, and a legal right to control the fund had been vested in the bank, we do not perceive that the result of this case could have been more favorable to the bank than the one to which the court has arrived. The bank, in that case, would have been a trustee for carrying into -efFect the implied intentions of the legislature. Upon the best settled principles, it would hav.e been bound to perform the trust, by investing the fund, so that it should be *171 beneficial to cestui que trust, and to act in relation to the fund] with the care of a provident owner. Willis on Trusts, 124, 125, 126, 127: Hovenden on Frauds, 486, and references.
In that case the State would have been the cestui que trust, because the bonds were to be paid out of the fund. If the trusts were not expressly declared, and if the trustee had any doubt as to the proper disposition of the fund, by application to a court of equity the t£usts would have been declared, and proper directions given. Willis, 124-5 and note 5.
However fully,’2 says a late writer, (Willis on Trusts, 125,) ua discretionary power of management may have been given, yet if a trustee omit doing what would be plainly beneficial, he will be answerable.” If he fails to do this, the cestui que trust may by bill in chancery obtain the aid of the court, to compel a performance of his duty. In that case too, the bank would have been liable to pay interest with half-yearly rests. As the fund would have been placed in bank for accumulation, if it were permitted to remain unproductive, the bank would have been responsible for the profits that should have been made. Willis, 181.
We are all satisfied, however, that the charter does not authorize the last aspect in which we have viewed the case. The bank was liable to pay the State the bonus annually, and the dividends half-yearly; and having refused to do so in the answer of their president, in 1833, the court is of opinion, that interest shall be paid on such balances as may have remained, after the payment of the accruing interest on the State bonds; and that the bank, upon the application, and under the direction of the treasurer of the State, shall invest the amount now due the State, in the stock of said bank, in payment for such additional shares, as the said treasurer may subscribe, for, by virtue of the act of 1833, c...73, § 2, and by virtue of the sixth section of the bank charter.
The clerk and master of this court will take and state an account, charging the bank the balance duo for dividends and bonus, after the payment of the interest on the State bonds, together with interest on such balances up to this time.
Decree reversed.